United States District Court
Southern District of Texas
**ENTERED**
November 09, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LORENA SANCHEZ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:24-cv-02641 |
| | § | |
| ASRC INDUSTRIAL SERVICES (AIS), ARCTIC PIPE INSPECTION (API), and ARCTIC TESTING AND INSPECTION (ATI), | § | |
| | § | |
| *Defendants*. | § | |

# ORDER

Pending before the Court is Defendants' ASRC Industrial Services ("AIS"), Arctic Pipe Inspection ("API"), and Arctic Testing and Inspection ("ATI") (collectively, "Defendants") Motion for Summary Judgment. (Doc. No. 44). Plaintiff, Lorena Sanchez, responded in opposition, (Doc. No. 49), and Defendants replied. (Doc. No. 58). After reviewing the briefing and applicable law, the Court **GRANTS** Defendants' motion. (Doc. No. 44).

## I. BACKGROUND

Arctic Slope Regional Corporation is the parent holding corporation of AIS which, in turn, holds two wholly owned subsidiaries, API and ATI. (Doc. No. 1, ¶ 11). Plaintiff, a Mexican-American, Hispanic female, was employed by ATI as a Health, Safety, and Environmental ("HSE") Coordinator between April 2019 and September 2020. (Doc. No. 49, Ex. 1; Doc. No. 44, Ex. G, 203:8-20). During this time, Sanchez was involved in daily operations for ATI by visiting client sites, conducting various safety initiatives, and ensuring that ATI was compliant with various safety requirements. (*Id.*). She reported to her direct supervisor, Stephen Hollier, and to API President, Jim Hildebrandt. (Doc. No. 49, Dep. of Sanchez, 17:6-14; Doc. No. 1, ¶ 12). She worked

regularly with others in the office including Kyle Crickmer, Ginger Teague, and Julianne Dennis. (*See* Doc. No. 49, Ex. 11).

Plaintiff testifies that throughout her employment at ATI, Crickmer would use derogatory language about minority employees. Specifically, Sanchez asserts that he would regularly use the term "damn Mexicans," would say that "females belong in the kitchen," and suggest that a man would do a better job than Sanchez would in her position. (Doc. No. 49, Dep. of Sanchez, 181:5-22).[1] Tony DeLeon, the former Vice President of ATI, stated that many people reported that Crickmer used language such as calling Hispanic employees "wetbacks" or "spics" and called a Black employee "boy" while using the N-word regularly. (Doc. No. 49, Ex. 46, ¶ 9). Plaintiff also testifies that Crickmer once called her "spicy Señorita." (Doc. No. 44, Ex. G, 206:25-207:2). Plaintiff further alleges that Crickmer engaged in inappropriate and sexually harassing conduct with another female employee, Amanda Clonts. (*Id.* at 184:22-186:7). This account and others were corroborated by DeLeon who claimed that Crickmer made "predatory" advancements towards an intoxicated Clonts and once fondled her breast in public. (Doc. No. 49, Ex. 46, ¶¶ 13-15). Sanchez testified that she complained to Hollier and DeLeon about Crickmer's treatment of her, stating that he was a "racist." (Doc. No. 44, Ex. G, 179:9-12). DeLeon affirms that Sanchez openly opposed Crickmer in a way that others did not. (Doc. No. 49, Ex. 46, ¶ 17).

Beginning in July 2022, Teague began to receive complaints from one of ATI's largest clients, LyondellBasell, about the lack of safety presence at their worksite. (Doc. No. 44, Ex. B, ¶ 5). Teague attempted to contact Sanchez to remedy the issue but did not get a response. (Doc. No. 44, Ex. 93). She then attempted to work through DeLeon to encourage Sanchez to remedy the

---

[1] The summary judgment evidence is unclear about whether Plaintiff ever heard Crickmer use these terms or say these things or if she is testifying about what others have told her. Plaintiff admits that Crickmer never called her a "damn Mexican" to her face but claims that he has called her that behind her back. (Doc. No. 44, Ex. G, 186:23-25). She otherwise contends that he used such terms generally as an everyday occurrence. (Id. at 186:8-13).

issue. (*Id.*). Teague also mentioned in weekly operations meetings the negative feedback she had received regarding ATI's safety presence, or lack thereof, at key-client worksites. (Doc. No. 44, Ex. C, ¶ 10). Around the same time, Crickmer also began having issues with Sanchez's work performance that he attempted to remedy both with Sanchez directly and through her supervisors. (Doc. No. 44, Ex. C, ¶¶ 4-9). Crickmer had a formal meeting with Hollier to discuss Sanchez on August 23, 2022. (Doc. No. 44, Ex. C, ¶ 9).

On September 6, 2022, Tony DeLeon, a Hispanic man, was asked to take a leave of absence from ATI and subsequently left the company.[2] On September 7, 2022, ATI's Quality Assurance Lead, Raymond Lyerla, emailed Hildebrandt with concerns regarding Sanchez's work performance. (Doc. No. 44, Ex. 35). At that time, Hildebrandt and Crickmer decided to investigate these complaints further by pulling Sanchez's badge logs which recorded how often she had actually visited client sites. (Doc. No. 44, Ex. C, ¶ 11; Ex. 4).

Following DeLeon's departure from ATI, Hildebrandt held an operations meeting to discuss his departure. (Doc. No. 44, Ex. A, ¶ 7). During that meeting, Sanchez stated that a unit inspector from LyondellBasell had expressed a desire to take its business elsewhere if DeLeon was not rehired:

> I met with Gilbert [Gonzalez] yesterday. That was his very first question, did they run Tony off or did he leave? I said, I don't know. I said, I really don't know. He's already sent a message for you guys. I can tell you after the meeting, or I don't know if you want me to say it here. . . I'm going to almost quote what he said. . . He said, I want you to take this back to your company. I welcome you to repeat it. I gave most of my business to Arctic because DeLeon was there. . . I appreciated him in that position because it showed how diverse your company is, which I truly appreciate. Starting today, unless DeLeon gets back in that position, which I really hope he does, [Mistras] will be getting most of my business.

---

[2] The reasoning and factual basis for this leave of absence is disputed. Defendants testify that he was asked to leave because he used the derogatory term "darkies" to reference clients of Nigerian descent. (Doc. No. 44, Ex. A, ¶ 6). DeLeon asserts that he was asked to leave after he began investigating Crickmer's allegedly discriminatory and harassing behavior. (Doc. No. 49, Ex. 46, ¶¶ 10-11).

(Doc. No. 44, Ex. 11, 10:25-12:5). Others at the meeting responded by stating that they had spoken with Gonzalez earlier that week regarding DeLeon's departure, and he had not mentioned this to them. (*Id.* at 12:22-14:10). It was decided that Hildebrandt should sit down with Gonzalez to better understand his position. (*Id.* at 14:9-15).

Following this meeting, Teague received a phone call from Gonzalez in which Gonzalez told her that he had just received a call from Sanchez that "made him feel the need to call [Teague] and clarify his stance about Mr. DeLeon's departure." (Doc. No. 44, Ex. B, ¶ 10). In this phone call, Gonzalez allegedly stated that Sanchez had misconstrued his words and that DeLeon's departure was not going to affect LyondellBasell's relationship with ATI. (*Id.*). Teague contacted Hildebrandt and relayed this information. (Doc. No. 44, Ex. 33). Both from the fact that Sanchez had called Gonzalez before Hildebrandt had gotten the chance and from the contents of the call, Hildebrandt determined that Sanchez had acted against ATI's best interest and was attempting to sabotage the company's relationship with LyondellBasell. (Doc. No. 44, Ex. A, ¶ 12). Hildebrandt thereafter met with Crickmer to discuss the information he had received from Teague, at which time Hildebrandt told Crickmer that he [Hildebrandt] had decided to terminate Sanchez. (Doc. No. 44, Ex. C, ¶ 15). Hildebrandt asked Crickmer to inform Sanchez of his decision to terminate her on the following Monday, September 12, 2022. (*Id.*).

On September 12, 2022, as per Hildebrandt's instruction, Crickmer informed Sanchez of the decision to terminate her employment because Hildebrandt felt that she had gone against the best interest of the company in her communications with Gonzalez. (Doc. No. 44, Ex. 12, 3:18-14:1). He thereafter sent an email to HR alerting them to the decision. (Doc. No. 44, Ex. 39). ATI hired Michael Jordan, a white male, as HSE Coordinator in Sanchez's place at a higher hourly rate than it was paying Sanchez. (Doc. No. 44, Ex. C, ¶ 23).

## II. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## III. ANALYSIS

Sanchez brought discrimination claims on the basis of race, color, national origin, sex, and a retaliation claim under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 of the Civil Rights Act of 1866 ("§ 1981"). (Doc. No. 1). Sanchez also sues Defendants for

a hostile work environment harassment on the basis of race and sex. (*Id.*). The Court addresses each of these claims below and hereby **GRANTS** Defendants' Motion for Summary Judgment. (Doc. No. 44).

**A. Claims against API and AIS**

Defendants API and AIS argue that Plaintiff cannot assert Title VII claims against them as they do not have an employer-employee relationship. Plaintiff was employed by ATI which is a subsidiary of AIS and a sister company to API. Sanchez responds that the Court should regard the three entities as a single, integrated enterprise for the purposes of liability for her claims. To determine whether a court should consider the seemingly distinct companies as a single, integrated enterprise in this context, courts look to four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983). The essential question then is "what entity made the final decisions regarding employment matters related to the person claiming discrimination." *Id.* When discerning whether a parent company exercised control beyond that which is typical in a parent-subsidiary relationship, courts consider (1) the extent to which the parent is directly involved in daily decisions, (2) whether there are shared personnel, records, and equipment, (3) commingled assets, (4) commingled books, (5) who issues the subsidiary's paychecks, and (6) who prepared the subsidiary's tax returns. *Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, 611 F.Supp.3d 363, 382 (W.D. Tex. 2020), *aff'd sub nom. Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918 (5th Cir. 2021).

Plaintiff claims that AIS, ATI, and API shared policies, handbooks, and oversight. Deposition testimony of Andrew McClain, AIS Senior Vice President of People, shows that AIS made a concerted effort to "harmonize the performance management systems" and provide

oversight on all operating companies. (Doc. No. 49, Ex. 6, 7:1-11). Sanchez, an employee of ATI, was provided an Employee Handbook from API and ASRC, but not for ATI. (Doc. No. 49, Dep. of Sanchez, 113:25-114:15). She further demonstrates that there is significant personnel overlap as Hollier, Sanchez's direct supervisor, was actually an employee of API, (Doc. No. 49, Dep. of Hollier, 7:22-8:5) and Sanchez serviced both ATI and API as Safety Coordinator, (Doc. No. 49, Dep. of Sanchez, 24:21-22; 32:1-5). Evidence also shows that AIS exercised control over (or at least involvement in) employment decisions for ATI as McClain was involved in DeLeon's leave of absence. (Doc. No. 49, Ex. 46, ¶ 34). Plaintiff's Benefits Enrollment Form explicitly states that her benefits are "paid by API." (Doc. No. 49, Ex. D).

While Defendant points out that ATI is undeniably the entity that hired her, paid her, and ultimately terminated her, the evidence put forth by Sanchez raises a fact issue regarding the extent to which ATI, API, and AIS operated as legally distinct entities.[3]

**B. Discrimination in termination.**

**1. Legal Standard**

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual on the basis of that individual's race, religion, color, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove intentional discrimination under Title VII either with direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture*, 235 S.W.3d 219, 222 (5th Cir. 2000). Where a plaintiff relies on circumstantial evidence, the Court applies the *McDonnell Douglas* burden-shifting framework. *Id.* Under that framework, the plaintiff bears the burden of establishing his prima facie case of discrimination by showing: (1) he is a member of a protected class; (2) he was qualified for the position or benefit; (3) he was subject to an adverse

[3] The Court notes that the evidence also demonstrates that Hildebrandt, the President of A<u>P</u>I, made the decision to fire Sanchez, an employee of A<u>T</u>I. (emphasis added).

employment action; and (4) others similarly situated but outside of plaintiff's protected class experienced more favorable treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. The burden on the employer is only one of production, not persuasion. *Russell*, 235 S.W.3d at 222. Once the employer carries its burden, the plaintiff must then present substantial evidence that the employer's "proffered reason is a pretext for discrimination." *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 875 (5th Cir. 2019) (quoting *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 426 (5th Cir. 2017)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Wallace v. Seton Fam. of Hosps.*, 777 Fed. App'x 83, 89 (5th Cir. 2019). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered reason is false or unworthy of credence." *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 218 (5th Cir. 2003) (quoting *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578. As employers are entitled to be unreasonable in terminating their employees, it is the employee's "burden to create a fact dispute as to reasonableness that could give rise to an inference of discrimination." *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022).[4]

---

[4] *Owens* seemingly revives the Fifth Circuit's former "pretext plus" analysis under *McDonnell Douglas* in which a Plaintiff cannot survive summary judgment merely by showing Defendants' proffered reason to be false but must also raise the inference that the true motivation was discriminatory. This Court understands this decision to require a totality of the circumstances analysis to determine if the arguments regarding falsity also give rise to an inference of discrimination.

**2. Pretext**

Defendants satisfy their burden of production by producing evidence that they terminated Sanchez's employment not because of discrimination but because they believed her to have gone against the best interests of the company and sabotaged their relationship with a large client.[5] (Doc. No. 44, at 10-11). In response, Sanchez argues that this reasoning is pretextual both because she suffered disparate treatment and because the proffered reason was false or unworthy of credence. (Doc. No. 49).

First, Sanchez fails to raise a fact issue regarding disparate treatment. To show pretext through disparate treatment, a plaintiff must "show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001). In identifying a qualifying comparator employee, courts look to whether the employees "held the same job or responsibilities, shared the same supervisor or had their employment determined by the same person, and have essentially the same or comparable violation histories." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Sanchez argues that ATI's treatment of Crickmer is evidence of discriminatory animus demonstrated through disparate treatment as he, a white man, was treated more favorably when coworkers made allegations against him. (Doc. No. 49, at 24-25). This fails, however, to raise a fact issue regarding disparate treatment as Crickmer and Sanchez held different jobs and responsibilities, had different supervisors, and were accused of engaging in different forms of misconduct.

---

[5] For the purposes of this Motion, Defendants do not dispute that Sanchez can state a prima facie case of discrimination. The Court, therefore, need not discuss whether Sanchez raises a fact issue regarding her prima facie case.

Sanchez raises several arguments attempting to establish that Defendants' proffered reason for her termination was false or unworthy of credence. Defendants state that while they were experiencing issues with Sanchez's work performance and had started to investigate her absences at client projects, the reason they ultimately decided to terminate her employment had nothing to do with her failure to be present at a client's worksite. Her termination was due to the incident with Gonzalez. (Doc. No. 44, Ex. I, 37:20-38:5). Plaintiff's strongest argument that this reason is false or unworthy of credence is really an aggregation of the contentions put forth in her responding brief. She argues that while Hildebrandt may have made the ultimate call, he did so under the influence of Crickmer who was driven at least in part by discriminatory animus to terminate Sanchez. She supports this theory with evidence of Crickmer's involvement in her termination, Hildebrandt's departure from company policies regarding termination, his minimal investigation of the allegations prior to her termination, and the fact that DeLeon, another Hispanic employee, was terminated less than a week prior. When broken down into its component parts, however, the evidence provided does not create a fact issue suggesting that Defendants did not actually terminate Sanchez because she was actively working to undermine the company but rather because she was a Hispanic woman.

*i. Crickmer's alleged involvement in the termination process*

Sanchez argues that Crickmer was not only directly involved with her termination process but that he also intentionally led Hildebrandt to the ultimate decision to terminate. In support of this assertion that Crickmer was involved, Sanchez points to Crickmer and Hildebrandt's use of the pronoun "we" both in testifying regarding the decision and in contemporaneous documentation of the termination. (Doc. No. 49). Crickmer's email to HR on September 12, 2022, states that "*we* terminated Lorena Sanchez's employment." (Doc. No. 49, Ex. 35) (emphasis added). Further, in Hildebrandt's deposition, he testified that he, Crickmer, and Julianne Dennis—or generally, the

company—made the decision to terminate. (Doc. No. 49, Dep. of Hildebrandt, 36:17-37:15). Crickmer and Hildebrandt both testified that they discussed the termination after Teague informed Hildebrandt of her phone call with Gonzalez and that this conversation ended in Hildebrandt deciding to terminate Sanchez due to the Gonzalez incident. (Doc. 49, Dep. of Crickmer, 150:7-15).

It is undisputed that Crickmer was supportive of the decision to terminate Sanchez and physically informed her of the decision himself. Crickmer testified that he agreed with Hildebrandt's decision, (*Id.* at 151:1-3), felt that Sanchez's job performance "was an issue," (*Id.* at 113:15-16), and that he was personally not happy with her performance. (*Id.* at 109:7-8). Crickmer was part of a separate investigation into Sanchez's work performance at the time due to alleged client complaints regarding the lack of safety presence on the properties to which Sanchez was assigned. (Doc. 44, Ex. C , ¶¶ 3-9; Doc. 44, Ex. 35; Doc. 44, Ex. B, ¶ 5).[6] Crickmer addressed six issues with Hollier, Sanchez's direct supervisor, and Hollier conducted his own investigation into Sanchez's performance. (Doc. No. 49, Ex. 55). Crickmer informed Sanchez of her termination on September 12, 2022, before Hollier could complete his investigation, pursuant to Hildebrandt's instructions. (Doc. No. 49, Dep. of Crickmer, 108:14-20). Hollier ultimately disagreed with the sentiment that Sanchez should have been terminated, testifying that "Lorena was doing things that I thought were okay and that were right and then some things that—that weren't right." (Doc. No.

[6] Sanchez argues that Defendants contradicts themselves as they simultaneously testify both that prior to September 9, 2022, Sanchez was "not on the radar to be terminated," (Doc. No. 49, Dep. of Hildebrandt, 49:2-6), and they were getting "some documentation," (Doc. No. 49, Dep. of Crickmer, 138:6-10), in order to fire her by pulling her badge logs and otherwise investigating the complaints on September 7, 2022. (Doc. No. 49, Ex. 3). The Court does not find this to be the "devastating evidence" Sanchez claims it to be as this was not the ultimate reason for her termination and because investigating an employee based on client complaints does not raise an inference of discrimination. Companies routinely investigate an employee's performance following a client complaint. The Court also notes that the characterization of this investigation as "gathering documentation" to terminate Sanchez came from Plaintiff's counsel, not Crickmer or Hildebrandt.

49, Dep. of Crickmer, 192:22-24). Hollier was upset when Hildebrandt terminated Sanchez without consulting him. (Doc. No. 49, Dep. of Hollier, 146:13-15).[7]

The evidence of Crickmer's involvement does not raise a genuine issue of material fact as to the truthfulness or credibility of Defendants' reason for terminating Sanchez. The summary judgment evidence indicates that Teague and Lyerla had reported complaints about Sanchez to Hildebrandt and Crickmer. (Doc. No. 43, Ex. 35; Ex. B, ¶ 5). It further shows that Crickmer, as Operations Manager, was investigating the complaints "to support or refute" the clients' claims. (Doc. No. 44, Ex. K, 137:16-17). Even assuming that Crickmer acted with discriminatory motives by investigating the client complaints against Sanchez, it was not this investigation that led to her termination. (Doc. No. 44, Ex. I, 37:20-38:5). Sanchez asks the Court to infer from Crickmer's involvement that (1) Hildebrandt would not have otherwise decided to terminate Sanchez for the Gonzalez incident and (2) despite the nondiscriminatory evidence that clients were having issues with Sanchez's job performance, Crickmer supported the decision to terminate Sanchez for discriminatory reasons. In the absence of summary judgment evidence to support either assertion, the Court cannot make such inferences.

*ii. The nature of Hildebrandt's investigation and his alleged failure to comply with HR procedures*

Sanchez next argues that a jury could find that Defendants' proffered reason was pretextual because Hildebrandt failed to conduct an independent investigation and fired Sanchez without properly following HR policies. The first part of her argument rests on the cat's paw doctrine articulated by the Supreme Court in *Staub v. Proctor Hospital*. 562 U.S. 411, 421 (2011). This

[7] Sanchez adds to this argument that the characterization of Sanchez's actions as "sabotage" came from Crickmer. (Doc. No. 49, at 8). This assertion is based entirely on speculation, and therefore the Court does not consider it. Further, she argues that Crickmer was listed as the contact person on Sanchez's Texas Workforce Commission documentation. There is also no evidence of this in the documents provided to the Court. (Doc. No. 49, Ex. 27). Furthermore, having one's name on a government form as a contact person is not evidence of discrimination. The Court will disregard this argument.

doctrine states that if another employee's discriminatory animus was the proximate cause of the ultimate adverse employment decision against a plaintiff, it raises an inference of discrimination on the part of the decision-maker. *See Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757-58 (5th Cir. 2017). To establish liability based on this theory, Sanchez must produce sufficient evidence that (1) Crickmer, motivated by discriminatory animus, took actions intended to cause her to be fired and (2) those actions were a but for cause of her termination. *See id.* at 758. Further, Sanchez argues that Hildebrandt's decision is merely a rubber stamp on Crickmer's decision to terminate as evidenced by the lack of investigation and departure from HR protocols by Hildebrandt. *See Rios v. Rossotti*, 252 F.3d 375, 382-83 (5th Cir. 2001).

In *Rios v. Rossotti*, 252 F.3d 375 (5th Cir. 2001), the Fifth Circuit considered this theory, holding that when a discriminatory evaluation forms the basis upon which a supervisor makes a recommendation for an employee to receive certain awards, a factfinder may properly impute the discriminatory attitude to the decision-maker who thereafter decides to make an unfavorable recommendation. *Id.* at 382-83. "Where an evaluation is the sole basis or comprises a substantial basis on which the decision-maker acts, the evaluation may often constitute sufficient influence to fall under the 'rubber stamp' exception." *Id.* In *Rios*, however, the court was forced to reject this argument as plaintiff failed to provide evidence of discriminatory animus. *Id.* Therefore, even if the jury could find that the employer's actions were unreasonable, they could not infer that the action was discriminatory.

Sanchez argues that Hildebrandt "did not make the termination decision in a vacuum," and instead adopted the perspective of Crickmer wholesale without investigation. (Doc. No. 49, at 10). Since Crickmer is alleged to have expressed racially discriminatory remarks, Sanchez asks the Court to infer that he sought her termination out of this discriminatory animus and that Hildebrandt

later adopted such animus. The summary judgment evidence shows, however, that Hildebrandt made his decision to terminate Sanchez based on his own observations and credibility determinations once he learned from Teague of the phone call Sanchez made to Gonzalez immediately after the meeting. (Doc. No. 44, Ex. I, 37:20-38:5). Thus, even assuming that Crickmer sought to undermine Sanchez due entirely to racial or gender animus, Hildebrandt, after hearing from Teague of Sanchez's phone call, came to an independent conclusion to terminate based on an entirely different set of circumstances than those reasons Sanchez claims were presented by Crickmer. (*Id.*); *See Staub*, 562 U.S. at 421. Hildebrandt was not required to conduct further investigations by speaking with Gonzalez, Hollier, or even Sanchez as he was "entitled to limit his investigation and [] make credibility determinations against [Sanchez]." *See Johnson v. Louisiana*, 369 F.3d 826, 833 (5th Cir. 2004). Sanchez fails to provide sufficient evidence that Crickmer's influence was the cause of Hildebrandt's decision or that it substantially influenced his decision.[8]

Further, Sanchez argues that Hildebrandt's failure to comply with the standard procedures for investigating allegations against an employee before terminating them raises a fact issue regarding pretext. A "defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees." *Turner v. Baylor Richardson Medical Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) (quoting *Upshaw v. Dallas Heart Group*, 961 F.Supp. 997, 1002 (N.D. Tex. 1997)). Conversely, the Fifth Circuit has repeatedly held that "an employer's failure to follow its internal protocols . . . can be evidence of pretext." *Sears v. Zions Bancorporation NA*, No. 22-10448, 2022 WL 1800779, at *4

---

[8] She further fails to provide evidence that even if Crickmer had influenced Hildebrandt's decision that his influence would have been driven by a discriminatory rather than legitimate motive. *See Owen v. Circassia Pharm., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022).

(5th Cir. June 2, 2022). Failure to follow even non-mandatory policies may give rise to pretext. *Id.* Sanchez alleges that Hildebrandt conducts investigations in a disparate manner as her termination was expedited while allegations against Crickmer were thoroughly vetted and ignored. The employee handbook supplied to Sanchez—and the one with which she now claims Defendants failed to comply—does not require investigation prior to termination. (Doc. No. 49, Ex. 8, p. 13). The Progressive Discipline and Termination procedures state that such discipline would "involve[] a series of escalating steps, each involving a warning of the consequences of further misconduct or performance problems by the employee." (*Id.*). This policy, however, is explicitly left up to the discretion of the employer as the "use of progressive discipline procedures is not mandatory."[9] (*Id.*). Similarly, the AIS Handbook sets out the general procedure for corrective action but notes that "[t]he Company reserves the right to bypass steps of progressive discipline and take whatever action it deems appropriate." (*Id.* at 33). Hildebrandt testified that once he learned of Sanchez's insubordination involving a major client, he determined that no additional investigation was necessary before she was terminated. (Doc. No. 44, Ex. I, 212:12-21). Hildebrandt's decision to exercise his discretion to expedite Plaintiff's termination after hearing about the post-meeting phone call from Teague is not significant enough of a departure to raise a fact issue as to whether Defendants' proffered reason is false or unworthy of credence.

*iii. Hollier's disagreement with the decision to terminate Sanchez.*

Next, Sanchez asserts that Defendants' proffered reason is false because her own supervisor saw no reason to terminate her employment. Plaintiff first argues that Hildebrandt violated standard HR principles by circumventing Hollier. As noted above, there was no HR policy at ATI, API, or AIS that required Hildebrandt to follow a particular practice or procedure when

[9] This same policy manual lists "insubordination" as grounds for discipline and/or termination. (Doc. No. 49, Ex. 8, p. 13).

terminating an employee. To the extent Plaintiff is asserting that Hildebrandt's failure to abide by "standard" or "best" procedures for terminating an employee raises an inference that his reasoning for doing so is false, unworthy of credence, or a veil for discrimination, she provides no evidence that would allow the Court to make such an inferential leap.

She then claims that had Hollier been part of the discussion, he would have disputed the findings of Crickmer's investigation into Sanchez's job performance and disagreed with the decision to terminate. Initially, Hollier's testimony does not, as Plaintiff suggests, state that he found no fault with Sanchez's job performance. He testified that "Lorena was doing things that I thought were okay and that were right *and then some things that—that weren't right*." (Doc. No. 49, Dep. of Hollier, 192:22-24) (emphasis added). Secondly, even if Hollier vehemently opposed Sanchez's termination on the grounds for which Crickmer was conducting his investigation, these grounds were not the basis of Sanchez's termination. (Doc. No. 44, Ex. A, ¶ 16). Hollier was not present at the September 9 meeting in which Sanchez allegedly misrepresented Gonzalez's words and after which she allegedly called Gonzalez. (Doc. No. 44, Ex. 11). Therefore, the fact that Hildebrandt chose not to wait and discuss Sanchez's termination with Hollier does not raise a fact issue regarding pretext.

*iv. Teague's failure to provide contemporaneous documentation of the alleged client complaints.*

Next, Plaintiff claims that, because Teague did not tell her the names of the specific clients who complained about Sanchez's job performance and consequently frustrated Sanchez's efforts to remedy her relationship with those clients, a jury could infer that the alleged complaints were fabricated. Teague testified that safety representatives from four separate clients contacted her or Lyerla to complain about Sanchez's presence (or lack thereof) on their properties. (Doc. No. 44, Ex. L, 18:23-19:17; 22:2-15; 45:14-46:13). This is corroborated by contemporaneous emails from

Lyerla to Hildebrandt documenting the same complaints. (Doc. No. 44, Ex. 35). Teague testified that she did not share with Sanchez who had made these complaints as part of a broader "business strategy." (Doc. No. 49, Dep. of Teague, 86:24-88:3). Even reading all of this testimony in the light most favorable to Sanchez, it fails to support the inference that the complaints were fabricated and further that Hildebrandt was thereby affected in his decision to terminate her—a decision that was predicated on an entirely different allegation of insubordination. This evidence fails to create a fact issue suggesting that the proffered reason is false or unworthy of credence.

*v. DeLeon's leave of absence less than a week before Sanchez's termination*

Plaintiff argues that a reasonable fact finder could infer from Defendants' contemporaneous treatment of DeLeon and prior treatment of Victor Garcia that her termination was part of a pattern and practice of ATI aimed to rid ATI management of all Hispanic employees. Garcia was employed by ATI as Director of Operations in 2019 and was demoted on July 6, 2021. (Doc. No. 41, p. 7). DeLeon was the Vice President of ATI until September 7, 2022, when he was asked to take a leave of absence. (Doc. No. 49, Ex. 46, ¶ 34). On the same day, Crickmer requested that Kristen Freimuller, HR Administrator for ATI, run Sanchez's badge logs as part of his ongoing investigation into the client complaints against Sanchez. (Doc. No. 49, Ex. 3). Sanchez was terminated on September 12, 2022. (Doc. No. 49, Ex. 39). From this, Plaintiff suggests that a factfinder could infer that DeLeon's and Sanchez's terminations were not isolated incidents, but rather a coordinated effort to dismiss all Hispanic management from ATI.

An employee may use "pattern or practice" evidence to prove pretext. *See Wyville v. United Companies Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000). To prove pretext under this theory, a plaintiff must establish that the discrimination "was the company's standard operating procedure—the regular rather than the unusual practice." *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875 (1984). A plaintiff may show this by providing anecdotal evidence that the company

routinely treated similarly situated employees in the same way that they treated plaintiff. *Wyvill*, 212 F.3d at 302. Testimony from employees who had "different supervisors, who worked in different parts of the employer's company, or whose terminations were removed in time from the plaintiff's" could not be probative as to pretext. *Id.*

Plaintiff argues that ATI's treatment of Garcia, DeLeon, and herself are sufficient to raise the inference of pretext in her individual claim of discrimination. This is insufficient to meet the standard set out above and fails because DeLeon and Garcia were not similarly situated to Sanchez. DeLeon was the Vice President of ATI. (Doc. No. 49, Ex. 46, ¶ 2). Garcia was the Director of Operations and direct supervisor to Crickmer. (Doc. No. 41, p. 6). Sanchez was a Health, Safety, and Environmental Coordinator or Safety Lead. (Doc. No. 44, Ex. G, 15:20-22). Each was terminated for a different reason. Thus, they held different positions and worked under different supervisors. Further, three examples of alleged discriminatory conduct is insufficient to raise an issue of fact that it was ATI's "standard operating procedure" to treat Hispanic management in this way.

*vi. Inconsistent and shifting reasons for Sanchez's termination*

Finally, Plaintiff claims that Defendants have offered shifting and inconsistent explanations for her termination. "When an employer offers inconsistent explanations for its employment decisions at different times . . . the jury may infer that the employer's proffered reasons are pretextual." *Staten v. New Palace Casino, LLC.*, 187 Fed. Appx. 350, 359 (5th Cir. 2006). Thus, if Defendants have provided inconsistent explanations for their decision to terminate Sanchez's employment, such evidence could create a genuine issue of material fact as to pretext.

On September 12, 2022, Crickmer emailed HR notifying them of Sanchez's termination. (Doc. No. 49, Ex. 39). The following day, Crickmer followed up with HR to explain the reasoning behind her termination. (Doc. No. 49, Ex. 34). He cited the incident with Gonzalez, stating that "it

seemed she was actively working against the interests of ATI." (*Id.*). Hollier's notes suggest that he was told the reasoning for the termination was because "everyone was tired of the negative attitude, arguing, and log confirming Lorena was not visiting sites and then icing on the cake was recording a conversation with a customer."[10] (Doc. No. 49, Ex. 55). Most recently, in Defendants' Motion for Summary Judgment, (Doc. No. 44), they characterize the reason as unauthorized action in defiance of an order from Hildebrandt. (*Id.* at 12-13). Plaintiff claims that this is not only inconsistent with the previously proffered reasons but also false according to the transcript of the September 9 meeting. Plaintiff notes that at no point in the September 9 meeting did Hildebrandt say that no one was to speak to Gonzalez until he had a chance to speak with him directly. The transcript does, however, evidence a clear desire for Hildebrandt to talk with Gonzalez without any interference. (Doc. No. 49, Ex. 11, 14:11-15). Teague noted in her declaration that she understood from the meeting that "no one else was to initiate communication with Mr. Gonzalez regarding Mr. DeLeon's departure until Mr. Hildebrandt had met with Mr. Gonzalez." (Doc. No. 44, Ex. B, ¶ 9).

While the characterization of Plaintiff's misconduct may have varied in the years since the termination occurred, the underlying reason has remained consistent: Plaintiff engaged in a conversation with Gonzalez that Hildebrandt felt went against the best interests of the company. Whether it is characterized as defying a direct order or going against the best interest of the company, the conduct for which Defendants assert they fired Sanchez has remained the same.

---

[10] Exhibit 55 appears to be a log of Hollier's notes throughout the time period in question. Although the log of notes is in itself hearsay, the statement Plaintiff refers to here involves an additional layer of hearsay as Hollier is noting what Hildebrandt allegedly told him regarding the reasoning for Sanchez's termination. The hearsay exception for opposing party statements applies to Hildebrandt's statement, but Sanchez has offered no proof of an applicable exception that allows for Hollier's notes to be admitted. Nevertheless, to the extent Plaintiff may elicit such testimony from Hollier himself at trial, the contents of the statement could, under some circumstances, be admissible and therefore the Court will consider it at this stage.

Assuming hypothetically the Court agreed with Sanchez, the question then becomes whether Defendants' proffered reason for her termination was pretextual does so in a way that also raises the inference that the true motivation was discriminatory. Plaintiff's evidence "must, at the summary-judgment stage, permit a reasonable inference that the real reason was impermissible discrimination." *Owens*, 33 F.4th at 834. This Court finds that Plaintiff's summary judgment evidence fails to raise such an inference.

**C. Pay discrimination**

Title VII prohibits discrimination in employment, including compensation, on the basis of race and sex. *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 466 (5th Cir. 2021). The *McDonnell Douglas* burden shifting framework applies. *Id.* To establish a prima facie case, Plaintiff must show that she was a member of a protected class and that she "was paid less than a non-member for work requiring substantially the same responsibility. *Taylor v. United Parcel Service, Inc.*, 554 F.3d 510, 522 (5th Cir. 2008). The burden then shifts to the employer must then rebut the inference of discrimination with a legitimate, non-discriminatory reason for the pay disparity. *Id.* (citing *Ross v. Univ. of Texas at San Antonio*, 139 F.3d 521, 525 (5th Cir. 1998). The burden then shifts back to the plaintiff to raise an issue of fact that the proffered reason was pretextual with evidence that "both (1) rebuts the employer's non-discriminatory reason, and (2) creates an inference that race and/or sex was a determinative factor in the decision to pay one more than the other." *Id.* (citing *Ross*, 139 F.3d at 525).

Defendants do not argue that Plaintiff cannot establish a prima facie case. Uncontroverted summary judgment evidence shows that Plaintiff is a member of a protected class as a Hispanic female. (Doc. No. 44, Ex. G, 203:8-20). Following Plaintiff's termination, ATI hired Michael Jordan and paid him a higher hourly rate than they had paid Sanchez. (Doc. No. 44, Ex. C, ¶ 23).

Plaintiff asserts that Defendants "replaced [her] with a White male and then paid him double what [they] paid [her]." (Doc. No. 44, Ex. G, 210:1-6). This is not disputed by Defendants. Thus, Plaintiff has established a prima facie case of pay discrimination on the basis of race and sex.

Defendants state that they paid Jordan more because he had "roughly twice as much relevant experience" as Plaintiff. (Doc. No. 44, Ex. C, ¶ 23). They also note that Jordan had worked for ATI for the last 8 months doing exclusively "turnaround work," which was directly relevant to the HSE position. (*Id.*). Therefore, Defendants have proffered a legitimate, non-discriminatory reason for the pay disparity.

The burden shifts back to Plaintiff to rebut this reason and create an inference that her race or sex was a factor in the determination. Sanchez asserts that this reason is pretextual because the summary judgment evidence shows that Jordan was not more qualified than Sanchez. Sanchez's resume shows that she had worked in safety since March 2013 for 8 different companies before coming to ATI in 2021. (Doc. No. 44, Ex. 26). When Sanchez was hired, she had approximately 7 years of relevant experience. This includes work for various industries including energy, engineering and construction, and drilling and utilities. (*Id.*). Jordan's resume shows that he has worked for 18 years as a Safety Specialist or Safety Advocate in the oil and gas industry. (Doc. No. 44, Ex. 89). Defendants note that Jordan's experience is extremely relevant as he worked for two of ATI's direct competitors, Acuren Inspection and Mistras Group. (Doc. No. 44, Ex. C, ¶ 23). Jordan had also been working for ATI already and could easily transition into the position. (*Id.*).

Plaintiff directs the Court to consider Hollier's testimony that he considered Jordan to be "inexperienced" as he had previously done mostly "field work" as opposed to "office stuff." (Doc. No. 49, Dep. of Hollier, 177:1-25). Hollier, however, was not Jordan's supervisor and thus was unable to testify as to his job performance. (*Id.* at 177:6-7). As Defendants point out, Hollier's

opinion regarding Jordan's qualifications is immaterial as he did not decide to hire him, set his pay rate, or supervise him.[11] Moreover, it seemed to be a general complaint from clients that Sanchez had spent too much time in the office and not enough time in the field. Defendants also point to Casey Glasgow, a white male HSE Coordinator, who worked alongside Sanchez as an additional comparator. Glasgow held the same position as HSE Coordinator as Sanchez, but he was paid $2 per hour less than Sanchez for substantially the same work. (Doc. No. 44, Ex. C, ¶ 24).

The evidence put forth by Plaintiff fails to raise an issue of material fact as to whether Defendants' reasoning behind the difference in pay was pretextual.

**D. Retaliatory discrimination**

Title VII prohibits employers from discriminating against any employee for having engaged in a statutorily protected activity. 42 U.S.C. § 2000e-3(a). Before a plaintiff may file a claim under Title VII, she must first exhaust administrative remedies by filing a charge with the EEOC. *Preston v. Texas Dept. of Family and Protective Services*, 222 Fed. App'x. 353, 356 (5th Cir. 2007). In doing so, the "charge must contain an adequate factual basis so that it puts the employer on notice of the existence and nature of the charges." *Id.* Only once the exhaustion requirement is satisfied may a plaintiff proceed with a Title VII retaliation claim. Importantly, § 1981 does not include an exhaustion requirement.[12] 42 U.S.C. § 1981. Where a retaliation claim is premised on circumstantial evidence, it is analyzed under the *McDonnell Douglas* burden-shifting framework. *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005). To establish her prima facie case, Plaintiff must demonstrate that: (1) she engaged in protected activity, (2) an

[11] Plaintiff also asserts that Jordan's resume and experience is a "farce." (Doc. No. 49, at 38). Plaintiff fails to provide any evidence that the experience listed on his resume is misrepresented or inaccurate. The resume itself lists five positions, dating back to 2000, in which safety and compliance seemed to be involved in the job description. (Doc. No. 44, Ex. 89). Sanchez therefore fails to raise a fact issue regarding the legitimacy of Jordan's qualifications and relevant experience.

[12] Otherwise, Title VII and § 1981 retaliation claims are analyzed under the same standard. *See Body by Cook, Inc., v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017).

adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007).

*i. Exhaustion requirement under Title VII*

Defendants claim that Plaintiff failed to exhaust her administrative remedies because, although she filed an EEOC charge in which she checked the box marked "retaliation," she failed to include any factual basis upon which she bases her retaliation claim. (Doc. No. 44, 13-14). Plaintiff's EEOC charge notes racial and sexual harassment as well as alleging that Crickmer was looking for ways to terminate Sanchez. (Doc. No. 44, Ex. 99). It does not, however, describe any allegedly protected activity or identify what Plaintiff perceived to be retaliatory action taken against her. (*Id.*). Plaintiff responds to this argument by noting that Defendants seem to have been sufficiently put on notice of her retaliation claim given that they responded to it during the EEOC process. Indeed, Defendants did respond to this claim by stating: "she fails to allege that she engaged in any protected activity in order to form the basis of a retaliation claim." (Doc. No. 49, Ex. 48, at 5). Far from responding on the merits of Plaintiff's claim of retaliation, Defendant merely asserted the same defense then as they do now. The question for the Court is therefore whether merely checking the box without alleging any factual basis for a retaliation claim is sufficient to satisfy the exhaustion requirement.

The exhaustion requirement is underpinned by two principles: (1) to construe discrimination charges liberally, bearing in mind the sophistication of the parties involved, and (2) that the charge must contain adequate factual basis sufficient to put the employer on notice of the existence and nature of the charge and allow the EEOC an opportunity to obtain compliance. *Preston v. Texas Dept. of Family and Protective Services*, 222 Fed. App'x. 353, 356-57 (5th Cir.

2007). From this, courts are encouraged to broaden the scope of an investigation to any kind of discrimination "like or related to the charge's allegations." *Id.* (quoting *Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447, 451 (5th Cir. 1983)).[13] This is not without limitation, however, as *Preston* demonstrates. In that case, plaintiff alleged discrimination on numerous occasions on the basis of race and retaliation. *Preston*, 222 Fed. App'x. at 357. In her EEOC charge, however, she mentioned only two written admonishments. *Id.* Therefore, the Fifth Circuit held she had failed to exhaust with regard to the other instances of alleged discrimination. *Id.* Relatedly, in *Collins-Pearcy v. Mediterranean Shipping Co. (USA) Inc.*, the district court held that plaintiffs failed to exhaust their administrative remedies with regard to their retaliation claims because they did not check the "retaliation" box, but "most significantly, neither [p]laintiff alleged that they engaged in any form of protected activity." 698 F.Supp.2d 730, 763 (S.D. Tex. 2010). The relevant question at issue was whether the charge could "reasonably be expected to trigger an administrative investigation of retaliation." *Id.* Other courts have held that merely a checking the "retaliation" box, is insufficient to exhaust administrative remedies where the charge otherwise fails to allege any facts concerning retaliation. *See, e.g.*, *Givs v. City of Eunice*, 512 F.Supp.2d 522, 536-37 (W.D. La. 2001), *aff'd*, 268 Fed. App'x. 305 (5th Cir. 2008). In *Givs*, the court found that plaintiff's claim of retaliation was insufficiently related to the claims otherwise alleged with sufficient facts in the charge and thus could not be expected to trigger the administrative investigation. *Id.* at 537.

Here, Plaintiff checked the "retaliation" box, but ultimately failed to allege any facts related to her alleged protected activity or the adverse action she claims was retaliatory.[14] Plaintiff argues

---

[13] Plaintiff argues that this means the resulting Title VII claim can include any claim that is reasonably expected to grow out of the EEOC investigation. She provides two reasons why she believes her charge accomplishes this. Both are unavailing.

[14] The Court assumes that the adverse action Plaintiff is claiming is her termination. It is unclear if Plaintiff also asserts that the investigation into her work performance was also retaliatory.

that she provided facts sufficient for a retaliation claim to sufficiently "grow out of" the investigation as otherwise pled. (Doc. No. 49, at 30). She further argues that Defendants were sufficiently put on notice by the charge because they "devoted an entire section" of their EEOC defense to the retaliation claim. (*Id.* at 31). This Court disagrees. In order for the EEOC to conduct an investigation into the retaliation claim or for Defendants to adequately respond, they would need to understand what protected activity Plaintiff had engaged in and what she believed to have been Defendants' retaliatory response. Plaintiff's claims that she had experienced racial and sexual harassment by Crickmer and that he was looking for any reason to terminate her does not suffice no matter how liberally this Court construes Plaintiff's addendum. Defendant's three sentence response to the retaliation claim—which can hardly be characterized as devoting an entire section—merely notes what they now reiterate: that plaintiff failed to include sufficient facts to form the basis of a retaliation claim.[15]

*ii. Retaliation under § 1981*

As noted above, § 1981 does not include an exhaustion requirement. Therefore, Plaintiff's § 1981 retaliation claim is analyzed under the *McDonnell Douglas* burden shifting framework. Plaintiff is thus required to demonstrate: (1) she engaged in protected activity, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007).

Plaintiff alleges that she engaged in protected activity by complaining to her supervisors Hollier and DeLeon that Crickmer "was so racist towards [her]." (Doc. No. 49, Dep. of Sanchez, 198:18-199:9). She further argues she engaged in protected activity by opposing Crickmer's

---

[15] Even if Plaintiff had satisfied the exhaustion requirement under Title VII, her retaliation claim would fail for the same reasons outlined in the § 1981 discussion.

behavior towards another female coworker. (*Id.* at 179:16-19). This is corroborated by testimony from Hollier and DeLeon. (Doc. No. 49, Dep. of Hollier, 98:1-13, 183:11-20; Ex. 46, ¶ 17). Defendants argue that this is insufficient to constitute a prima facie case of retaliation for multiple reasons.

First, Defendants assert that these instances do not constitute "protected activity" as required by law because Sanchez's statements do not evince a reasonable belief that the complained of conduct constitutes a Title VII violation as is required under the statute. *See E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 237 (5th Cir. 2016). Sanchez seemingly did, however, believe that the alleged racial and sexual harassment that Crickmer was engaged in did constitute actionable conduct under Title VII. Far from being an isolated incident, Plaintiff testifies that Crickmer's allegedly racist/sexist comments were a regular occurrence. Further, a jury could reasonably find that, if proven to be true, it was reasonable for Sanchez to believe that Crickmer's interaction with Amanda Clonts was actionable. Therefore, Plaintiff raises a fact issue with regard to her protected activity.

Second, Defendants argue that Plaintiff cannot prove causation because Hildebrandt made the decision to terminate her, and he had no knowledge of her protected activity. The evidence demonstrates that Hildebrandt made the decision to fire Sanchez himself, but consulted with Crickmer, and Julianne Dennis in the process. (Doc. No. 49, Dep. of Hildebrandt, 36:17-22). To establish a prima facie case, Plaintiff must show that Hildebrandt knew about her complaints before terminating her employment. Plaintiff admits in her deposition that she never complained directly to Hildebrandt or to anyone in HR. (Doc. No. 49, Dep. of Sanchez, 201:4-6, 13-16). Hildebrandt and Crickmer both deny knowing that Sanchez had complained about Crickmer's conduct. (Doc. No. 44, Ex. A, ¶ 21; Ex. C, ¶¶ 19, 21-22). Plaintiff fails to supply any evidence that

Dennis knew about her complaints. While DeLeon asserts in his declaration that many employees complained to him about Crickmer and that Sanchez was one employee that was hurt by ATI's lack of a formal HR department, he never states that Sanchez complained to him or that he brought her complaints to Hildebrandt. (Doc. No. 49, Ex. 46). Similarly, Hollier testified that Sanchez had complained to him but never claims to have brought these issues to Hildebrandt.[16] (Doc. No. 49, Dep. of Hollier, 183:11-20). To whatever extent Crickmer and Dennis were involved in Hildebrandt's decision to terminate Sanchez, Plaintiff fails to show that any of them knew about her protected activity.

Finally, Defendants argue that even if Plaintiff could establish a prima facie case, her retaliation claim fails because she cannot demonstrate pretext. For the reasons analyzed above, the Court agrees that she cannot demonstrate pretext, and her retaliation claim fails.

**E. Hostile Work Environment**

To establish a claim of hostile work environment under Title VII or § 1981,[17] a plaintiff must prove: "(1) [she] belongs to a protected group;[18] (2) [she] was subjected to unwelcome harassment; (3) the harassment complained of was based on [her protected classifications]; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). For such a claim to be actionable, the environment must be "permeated with discriminatory intimidation, ridicule, and insult, that it is sufficiently severe or pervasive to alter the conditions of the victim's employment."

[16] He notes that if asked whether Sanchez complained to him about Crickmer, he would verify that she had. He does not say, however, that he had already passed these complaints along. (Doc. No. 49, Dep. of Hollier, 183:11-20).
[17] *See EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007); *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399-400 (5th Cir. 2021).
[18] Defendants do not dispute that Sanchez belongs to a protected group as a Hispanic woman.

*Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009). Harassment is sufficiently severe or pervasive to alter a term or condition of a victim's employment where it is "objectively hostile or abusive—meaning an environment that a reasonable person would find hostile or abusive—and is subjectively perceived by the victim as abusive." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 400 (5th Cir. 2021) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal citations omitted). In determining whether a workplace constitutes a hostile work environment, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey*, 286 F.3d at 268 (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000)).

Defendants argue that Plaintiff's claims fail as a matter of law because the acts about which she complained do not constitute unwelcome harassment that affected a term, condition, or privilege of her employment as defined by the Fifth Circuit. The Court will address Plaintiff's claims of sex and race/national origin harassment as the two bases of her hostile work environment claim in turn.

*i. Sexual harassment*

Plaintiff's claim of hostile work environment due to sexual harassment fails as a matter of law because Plaintiff did not personally experience most of the harassment that she alleges, and to the extent that she did, it did not constitute severe or pervasive harassment. Plaintiff bases her claim of sexual harassment on her personal observations of Crickmer's treatment of Clonts and on two comments Crickmer made either to or about Plaintiff.

The following is a list of the allegations that form the basis of Plaintiff's hostile work environment sexual harassment claim: (1) Plaintiff witnessed Crickmer ask Clonts to "lift her shirt

once" at a company function, (Doc. No. 49, Dep. of Sanchez, 180:4-8); (2) she heard from others that Crickmer had "fondled [Clonts's] breast" and appeared to be taking advantage of her at a bar, (Doc. No. 49, Ex. 46, ¶¶ 14-15); (3) Crickmer allegedly said "men would do a better job," (Doc. No. 49, Dep. of Sanchez, 181:10-12); (4) Crickmer allegedly said that "females belong in the kitchen, (*Id.* at 183:25-184:5).; (5) Crickmer allegedly said that "women were a distraction in the field," (*Id.*); and (6) Crickmer called Sanchez a "spicy Señorita." (Doc. No. 44, Ex. G, 206:25-207:2).

First, Plaintiff's claim fails because she did not experience the alleged harassment of Clonts beyond allegedly witnessing one instance of harassment and hearing about others second-hand. Summary judgment evidence pertaining to other members of Plaintiff's protected class is relevant to the extent such harassment creates a workplace climate permeated with such harassment. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 653 (5th Cir. 2012). The Fifth Circuit has acknowledged that "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."[19] *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 478 (5th Cir. 1989) (quoting *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985)). Although evidence of Crickmer's actions toward Clonts is relevant, it is insufficient in the absence of evidence that the workplace was otherwise pervaded with sexual harassment. Such is not the case here where all allegations were regarding Crickmer's treatment of one individual and a few offensive epithets.

Second, even assuming that all of the comments listed above had been in her presence and/or addressed directly to Sanchez and were directed as a critique of Sanchez, they fail to rise to

---

[19] In *Waltman*, this meant that the court could consider sexually explicit graffiti written on bathroom walls as evidence that Plaintiff experienced an atmosphere in which harassment was pervasive although it was not directly addressed to Plaintiff. *Waltman*, 875 F.2d at 477-78. When paired with evidence that several employees had touched Waltman in a sexual manner, that was sufficient to create a fact issue. *Id.*

the level of "severe or pervasive" as that term is defined by the Fifth Circuit. To determine if alleged harassment is severe or pervasive, courts look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey*, 286 F.3d at 268 (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000)). In *Septimus v. University of Houston*, the Fifth Circuit held that a plaintiff failed to meet the required standard. 399 F.3d 601, 612 (5th Cir. 2005). There, plaintiff was (1) subjected to a two-hour "harangue[,]" which others described as intimidating and inappropriate, by her male supervisor while she "sobbed uncontrollably[,]" (2) questioned in a mocking tone, and (3) described as a "needy old girlfriend." *Id.* at 606, 612. Similarly, in *Saketkoo v. Admins. of Tulane Educational Fund*, the Fifth Circuit held that although plaintiff was subjected to uniquely abrasive conduct, it did not rise to the level of severe or pervasive such that it affected a term of her employment. 31 F.4th 990, 1103-04 (5th Cir. 2022). There, plaintiff's supervisor cut plaintiff off, telling her it was not her place to speak on certain things, said that "[w]e don't need you thinking! We need you working[,]" chastised her for teaching, and otherwise yelled impatiently at her over the course of her 4 years of employment. *Id.* at 1003. On the other hand, the Fifth Circuit held that there was sufficient evidence that sexual harassment was severe and pervasive when an employer (1) yelled sex-based epithets—such as calling plaintiff "queer" or "f****t"— two-to-three times a day for months, (2) would approach plaintiff from behind and pretend to "hump" him two-to-three times per week, (3) exposed his genitals to plaintiff, and (4) suggested that plaintiff should perform oral sex on him. *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 459-61 (5th Cir. 2013).

Here, Plaintiff points to three comments regarding women in the workplace and one instance in which he referred to her as a "spicy Señorita." Beyond those four comments, she

conclusively asserts that Crickmer's comments were an "everyday" or "daily" occurrence.[20] (Doc. No. 44, Ex. G, 181:21-22). Plaintiff admits that neither Crickmer nor anyone else ever touched her or threatened her. (*Id.* at 196:13-17). While Crickmer's comments may have been "boorish and offensive," they do not rise to the level of severity required by the Fifth Circuit regardless of their frequency. *See Septimus*, 399 F.3d at 612. Accordingly, the Court finds no fact issue regarding a hostile work environment on the basis of sexual harassment of Sanchez.

*ii. Race/national origin harassment*

Plaintiff also claims harassment on the basis of her race and national origin.[21] In support of her claim, Plaintiff testifies that she and others heard Crickmer use derogatory terms daily. Specifically, Sanchez alleges that Crickmer would regularly use the term "damn Mexicans," refer to Hispanic employees in a derogatory manner as "Mexicans," use the terms "wetback" or "spic," refer to a Black employee as "boy," and frequently use the N-word.[22] (Doc. No. 49, Dep. of Sanchez, 181:10-12; Ex. 46, ¶ 9). She also testified that Crickmer once called her "spicy Señorita." (Doc. No. 44, Ex. G, 206:25-207:2). Plaintiff admits, however, that Crickmer never referred to her as a "damn Mexican" to her face, rather testifying that others would tell her that Crickmer was using such language. (*Id.* at 186:23-25). DeLeon corroborates in his declaration that other employees would report to him that Crickmer would use such language. (Doc. No. 49, Ex. 46, ¶ 9).

[20] The record is ambiguous whether Plaintiff's testimony to this effect was with regard to his comments about women or about Hispanic employees or both.

[21] The Court notes Defendants' argument that § 1981 does not protect against discrimination based on national origin pursuant to *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 613 (1987). This Court need not consider whether Plaintiff has a claim under § 1981 as it finds she does not present sufficient evidence to move forward under either Title VII or § 1981.

[22] Evidence of racial terms directed at a different protected class likely do not support Plaintiff's claim. While examples of similar harassment towards another protected class may support otherwise valid claims of a hostile work environment, they are insufficient on their own in the absence of frequent, severe, and pervasive hostility to Plaintiff's own protected class. *Hernandez*, 670 F.3d at 653.

Plaintiff must raise a genuine issue of material fact that she suffered severe and pervasive racial harassment such that it altered the conditions of her employment and created an abusive work environment. As noted above, this is both an objective and subjective inquiry. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes" in the conditions of Plaintiff's employment. *Brenyah v. Colombia Hosp. Corp. of Bay Area*, 181 F.4th 609, 626 (5th Cir. 2026) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotes omitted)). A court considers the totality of the circumstances, and thus second-hand harassment is relevant although less actionable than direct harassment. *See id.* (quoting *Arredondo v. Elwood Staffing Servs., Inc.*, 81 F.4th 419, 433 (5th Cir. 2023)). The Fifth Circuit has held that isolated racial epithets are insufficient to meet the standard of severe or pervasive harassment. *See Frazier v. Sabine River Auth. Louisiana*, 509 Fed. App'x. 370, 374 (5th Cir. 2013). The Fifth Circuit has recognized, however, that racially degrading comments and actions can create or contribute to a hostile work environment even when they are not specifically directed at an individual plaintiff. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477-78 (5th Cir. 1989).[23]

The Fifth Circuit analyzes whether a plaintiff has suffered severe and pervasive harassment such that it affected the conditions of her employment through a totality of the circumstances inquiry guided by many factors. A review of Fifth Circuit analysis on this point is instructive. In *Brooks v. Firestone Polymers, L.L.C.*, the court held that where plaintiffs alleged incidents of not being allowed to use a certain restroom, viewing offensive images on a video monitor, writing of racial slurs and depictions of "black face" on bathroom stalls, flying the American flag upside

[23] In *Waltman*, the court held that plaintiff had raised a fact issue regarding sexual harassment with evidence of several employees touching her in a sexual manner and directing sexual comments towards her and evidence of sexual graffiti on the walls, elevator, and bathroom. *Waltman*, 875 F.2d at 477. Although the graffiti was not specifically directed at plaintiff, it contributed to an otherwise pervasively abusive environment. *Id.* at 477-78.

down in response to the election of President Obama, and the placing of a noose inside a hardhat, it was insufficient to establish a prima facie claim because it presented no evidence as to how it affected the terms or conditions of their employment. 640 Fed. App'x. 393, 399-400 (5th Cir. 2016). Conversely, where a plaintiff suffered constant harassment by many of his coworkers likening him to an animal, making jokes about his African origin, mimicking his accent, calling him racial names, and refusing to speak to him, the court held that this constituted severe and pervasive harassment. *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 434 (5th Cir. 2022). Similarly, in *Woods v. Cantrell*, the Fifth Circuit held that a single instance where plaintiff's supervisor directly called him a "Lazy Money A** N*****" in front of plaintiff's subordinates sufficiently altered the conditions of his employment. 29 F.4th 284, 285 (5th Cir. 2022). Most recently, in *Brenyah v. Colombia Hospital*, the Fifth Circuit found that plaintiff had made a prima facie case of a hostile work environment with evidence of frequent and direct instances of harassment such as criticizing plaintiff's cultural food, mocking her accent, being told to "stay 12 feet away" due to race, and use of racial slurs when it caused plaintiff's work performance to suffer. *Brenyah v. Colombia Hospital*, 181 F.4th 609, 626-27 (5th Cir. 2026).

Defendants argue that Sanchez fails to meet the standard of severe or pervasive as illustrated by the above cases because four or five racially motivated comments over an 18-month period could not constitute severe or pervasive. Plaintiff does not allege that Crickmer made only four or five comments but rather that he constantly used such language about the Hispanic workers at ATI. In *Johnson v. TCB Const. Co., Inc.*, the plaintiff alleged that the company forced him to go to the bathroom in the woods, called him "ugly, "an old hermit," addressed him directly using the N-word once, and allegedly frequently used such language outside of plaintiff's presence. 334 Fed. App'x. 666, 671 (5th Cir. 2009). He further alleged that his supervisor frequently used the

N-word out of plaintiff's presence. *Id.* The court held that this was insufficient to meet the legal test for a hostile work environment. *Id.* Similarly, here, Plaintiff alleges that Crickmer prolifically used derogatory language outside of her presence and once called her a "spicy Señorita." This does not rise to the level of sufficiently severe or pervasive such that the Fifth Circuit has found it to infer an effect on Sanchez's work environment. *See Woods*, 29 F.4th at 285 (finding that the use of such an offensive epithet in front of plaintiff's subordinates on its own affected his ability to do his job).

Sanchez attempts to show that Crickmer's conduct actually did affect her ability to do her job and "unreasonably interfere[d] with [her] work performance" by pointing to her text messages with Hollier.[24] *Harris v. Forklift Sys., Inc.*, 510 U.S. 367, 371 (1993). The only other evidence this Court can identify in the summary judgment record to support the assertion that Plaintiff was affected in her ability to do her job is a text from Sanchez to Hollier[25] in which she states, "Im [sic] tired of [Crickmer] causing me stress. About my job. Im [sic] tired of feeling harassed. . . He has done this to me always since I started. He is a [] racist. I don't see him harassing anyone else this way."[26] (Doc. No. 49, Ex. 18, p. 24). Plaintiff did not choose to leave ATI at this time, however, and continued to work there until her termination in September of 2022.[27] Although a plaintiff is

---

[24] The Court notes that these texts are undoubtedly hearsay to the extent they are offered, as here, to prove the truth of the matter asserted—that she was considering quitting her job due to Crickmer's actions.

[25] The text in question appears only in a screenshot of Sanchez and Hollier's prior text messages on her Arctic-issued phone that Sanchez screenshotted and re-sent to Hollier after she had been terminated. In a surrounding text, Sanchez provides context: "This is when I was still employed. On the Arctic phone." (Doc. No. 49, Ex. 18, p. 24).

[26] The Court notes that Plaintiff's argument cuts both ways with this statement. On the one hand, Plaintiff uses this as evidence that the alleged harassment was affecting her ability to do her job and thus should constitute sufficient harassment to support her hostile work environment claim. On the other hand, however, it also undercuts her claims (1) that her termination was part of a broader scheme to eliminate all Hispanic leadership and (2) that Crickmer used such language pervasively about and to all Hispanic employees. This tends to suggest that Crickmer's behaviors did not create an atmosphere of pervasive harassment on the basis of race as Plaintiff claims as she claims to be the only one experiencing it.

[27] The Plaintiff fails to identify the date or time of this text message. Plaintiff testifies in her deposition that she had expressed to Hollier that she felt sick coming into work. The text message she references occurred after her termination: "Man. This turns my stomach remembering how Kyle always made me feel. I hate it there so much." (Doc. No. 49, Ex. 18, p. 24).

not required to quit his or her job in order to assert a hostile work environment claim, the fact that Sanchez did not do so and continued to feel as though she could do her job well indicates that she was not affected in her ability to do her job. In fact, Plaintiff has consistently rejected claims that her job performance was deficient in any manner, stating in a post-termination text message to Hollier, "[t]here was no reason to let me go." (Doc. No. 49, Ex. 18, p. 3; *See also* Doc. No. 41, p. 14-18; Doc. No. 49, p. 15-21).

The instances Sanchez alleges of racially inappropriate language are not sufficiently severe and pervasive to meet the bar set by the Fifth Circuit. Moreover, she fails to raise an issue of material fact as to whether it interfered with her work performance. Accordingly, the Court finds that Plaintiff failed to raise a material issue of fact that her work environment reached the level of hostility that the Fifth Circuit requires.

**CONCLUSION**

Based on the foregoing analysis, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. No. 44).

Signed on this 9th day of November 2026.

Andrew S. Hanen
United States District Judge